Mr. Rothfeld? Thank you, Mr. Chief Justice, and may it please the Court. In the Red River Compact, Oklahoma agreed that Texas would be allowed to use a specified quantity of water that is located in Oklahoma. Oklahoma is now trying to back out of that bargain. But its argument to this Court in support of its position is essentially that the Court  because that language is superfluous, that the Court should read into the Compact language that does not appear there, and that the Court should not give the text of the Compact what Oklahoma in its brief describes as talismanic significance. Our very different view is that the plain text of the Compact must control. In the Red River Compact, Texas and Oklahoma, along with Louisiana and Arkansas, agreed to allocate among themselves the waters of the Red River Basin. The Compact divides that basin into large areas called reaches and subdivides the reaches into subbasins. As to some of those areas, the Compact expressly allocates entitlement to water by State line. It says that the States may use the water within their boundaries exclusively. But in the section of the Compact, which is at issue here, Reach 2, Subbasin 5, the Compact uses a very different and unique language. That section, that subbasin, includes the territory of all three of the four compacting States. The boundaries of that subbasin are drawn not by State lines, but by reference to the last down-site dam sites before tributaries of the Red River flow into the river itself. Ginsburg. Mr. Rothfield, we are told that in other compacts, when they really mean to give one State the right to take another State's water, the provision in the Compact is much clearer, much more definite. This clause, the one that you rely on, is kind of sketchy, isn't it? It doesn't say how they're going to get it, if they're going to pay for it. There's a lot to be filled in. Well, the provision that we are relying on, I would say, is not sketchy at all. It is quite clear that all four of the compacting States are, in the language of the Compact, have equal rights to the use of water, defined water, in a defined area of the subbasin, so long as no State uses more than 25 percent of the water. That is quite express as to what is required. In the end, it's difficult to read that language to mean anything other than that the States can take this water. Scalia. What is the exact language? You want to read the exact language? The exact language is to refresh your recollection. It appears, it is reprinted on page 8 of the blue brief in the indented text, and it says, within this subbasin, the signatory States have equal rights to the use of, and then it defines the water that they have the rights to the use of, at times of normal flow, within the flow of the Red River at 3,000 cubic feet per second at the Arkansas-Louisiana border, provided that no State is entitled to more than 25 percent of the water in excess of this good amount. So the gist of the language is States have, all four signatory States have equal rights to the use of water. Breyer. It doesn't say that. It says no State is entitled to more than 25 percent. It doesn't say. I mean, that language doesn't say what happens if, in fact, there is a State that because of cliffs or something can't get the 25 percent to which it is entitled. It just doesn't say anything about it. Well, I have to disagree with that. Where does it say something about it? It says that the section is designed to allocate the water of the subbasin. And it says within the subbasin, States have equal rights to use of the runoff. That's the first part of it. The second part of it then says, provided that no State is entitled to more than 25 percent. Breyer. Does that mean that a State can, when it can't get its pipeline to the river, go into some other State and take the water out of that other State? I mean, I would have thought if that was their intent, there would be a mechanism for doing it, that you'd have some authority set up by the compact that would decide where and whether it's really true and how they're supposed to do it, and there is no such mechanism, rather, if there is such a right, which it doesn't say anything about. It's left to the State courts in different States to try to do what is an extremely complex and controversial administrative job. A couple of points to say about that. First of all, it is not at all a complex job. It's not at all complex when Oklahoma is going to say, Texas, go run the pipe to the south of the Red River, and Texas is going to say, I'm sorry, we can't get there, there's too much cactus. And then they're going to say, don't you know that, in fact, when you put your pipeline into Oklahoma, you are going to be taking part of the 25 percent that belongs to us? And Texas will say, no, we aren't. And then we'll have to have a way of measuring how much goes into the river at different places and what all these different pipelines are going to take out. You understand what I'm saying. I would have thought a mechanism would be set up to do that, and there is none. Roberts, again, several things about that. First of all, in all these other compacts to which Justice Ginsburg alludes that are cited by our opponents, which expressly allow for cross-border diversion, virtually none of them provide any of the kinds of details that you are describing. Breyer, but they do say expressly, and I don't know what the terrain is like in the other areas. And here it does not say anything about it. That's why I think we're here in the Court, because all it says is you can't take more than 25 percent. It doesn't say what happens when Texas is unable to get its 25 percent from the south. I'm now repeating myself, but you point to the language that says what I just said is not consistent with the language. What I say, I guess I will say two things about that. One, I think what you just say is, in fact, with respect, is not consistent with the language. I think that Which language is it not consistent? Equal rights to use of specified water. The subbasin is defined, again, not by State lines. It's defined by downstream dam sites. So it has created a pool of water in this subbasin, and it says that all four States have equal rights to use of this water, provided that none takes more than 25 percent. It seems to me that on the face of it, that is saying State lines are not relevant and that what we are looking at is a pool of water, the States can come and get it. That is particularly so, if I may just, I'm sorry. No, no, finish, but I think to the extent that there could be any ambiguity in that language viewed in isolation, in the context of the rest of the compact, there are places where the drafters of the compact, in fact, did refer to State lines. They said that States are entitled to use the water within their State boundaries. The respective States may use the water within their boundaries. They did not, the Framers did not use that language in this provision. Sotomayor, I think under your argument, and you can correct me if I'm wrong, that Louisiana could decide it doesn't want to wait for the flow of water to come to it, and it could just go right into Oklahoma-Homo, in which it shares no border, and I don't know how it's going to do that, and take its 25 percent. Does that make sense in terms of the language? I mean, you're talking about Texas, but Texas shares a border, and so it may be a little easier to cross the border line, but what's Louisiana going to do? Well, let me make two points about that. First of all, I think that not only does it make sense in the language, it's compelled by the language, because the language says within this subbasin, all four States have equal rights. Separately, there is another separate reach, reach 5 of the compact, is Louisiana's. And so the water flows into Louisiana. When the water gets to Louisiana, it's no longer within the subbasin, it's somewhere else. So the plain language of the compact compels the reading, compels the point that Louisiana could take its water from within the subbasin. Now, could it do that? The subbasin runs through to Arkansas to Louisiana, so it could go to Louisiana. Breyer, back to the first one, because what you've done is you've pushed me back to the equal rights. And now, if I'm going to fight you on it, I have to say the equal rights to water means equal rights to water arising within its boundaries. And all you have to say is equal rights to water arising anywhere in the subbasin. And if I just heard that, then I might say, okay, I think yours is a little better. But, but, we have this enormous administrative mess that would seem to be created, and both those interpretations seem possible. So let's go back to that and let me hear quite clearly, though, focused it. What's the answer? If I may just finish with Justice Sotomayor and I'll turn to that. I think the second answer to the question is the States are going to take the water from the closest point where they can get it. And so Louisiana is not going to go to Oklahoma if it's going to go into subbasin 5. It's going to go to Arkansas directly across the State line. Ginsburg. How does it do it? Does it have to apply to Texas? It has to apply to whichever. To Oklahoma. If it's going to Oklahoma, and this is partially in response to Justice Breyer, it would have to apply to the water authorities within Oklahoma. So what's going on here, Tarrant, the Texas Water District, is applying to the Oklahoma Water Resources Board. It will seek a permit. This will operate precisely in the same way as if an Oklahoma applicant is seeking a permit. You will go to the — you will go and say, I want to take water out of this point. The Water Resources Board will apply its ordinary standards to determine whether or not that can be granted. Ginsburg. Who wrecks the facilities to accomplish this diversion? Tarrant presumably will do that. If Tarrant needs to obtain rights of way, Oklahoma law provides for exercise of eminent domain, or Tarrant will simply purchase the property to do that. Kennedy. It's my understanding that there is a place where Texas can put a line into the river and then a subset of that question is the main stem of the river through — without going through Oklahoma property, other than perhaps just the bank itself. That, I think, is not correct as a factual matter. The Red River lies entirely within Oklahoma. And so Oklahoma, in order to get water out of the main stem, if Texas were to do that, it would have to go into Oklahoma. And, in fact, this is a response to, in part, to what I'm going to say. Kennedy. But you say entirely within Oklahoma just because of ownership of the bank? Or because of there's also some intervening property between Texas and the bank that Oklahoma owns? The border between Oklahoma and Texas is the south vegetation line of the Red River. And so, therefore, it's out of the river, past the bank, to the vegetation line. So in order to get water out of the main stem, Oklahoma — Texas would have to go into Oklahoma. Now, there is a group of laws that prohibit that. Oklahoma's current laws would, I would think, would prevent at any point, because the laws that Tarrant is challenging here are laws that are discriminatory Oklahoma laws that prevent any use of water originating in Oklahoma outside. Alito, when you say Texas has the right to go into Oklahoma, just think about that phrase. That's very striking. I mean, it sounds like they're going to send in the National Guard or the Texas Rangers. Right. And if I may, Justice Alito, that is a very misleading way of looking at it. And I think Oklahoma's brief suggests that the Texas Rangers are going to descend on Tulsa and seize the water. That is not what is competent. Alito, but you are saying that Oklahoma has — that Texas has the right to force Oklahoma to take private property in Oklahoma by eminent domain. You are saying that's necessary. There is an Oklahoma statute that says in order to — someone who has a permit to obtain water can exercise eminent domain. An Oklahoma person can do this, a Texas person can do this. How does Oklahoma apply its law in this situation? I assume there's normal priorities and they'll get applications from a lot of people, but they have to — what do they have to give Texas, up to 25 percent? I mean, they can't just say — deny it because another Oklahoma user has priority or all this. How does that fit in with the existing administrative structure? Well, Oklahoma cannot use more than 25 percent of the water within the subbasin. I think that our friends can see that because the language of the compact says no State is entitled to more than 25 percent. Within each State's 25 percent allocation, a resident water user of the State will apply to the Oklahoma — if they are seeking to take their water from Oklahoma, will apply to the Oklahoma Water Resources Board, which will assess that permit precisely as it assesses permits from Oklahoma residents. But it's got to give Texas at least up to its 25 percent, right? If there is a request for that much water from a Texas user and the Texas user has priority as a permit applicant against others who are seeking to take water from this particular — Well, I guess what I'm asking is, does the compact give Texas special priority apart from what Oklahoma — Oklahoma's priorities would be? No, it does not. It's — all — all the compact says is that Texas is entitled to take water from — within the subbasin. It's 25 percent. Now, when it applies in a particular place, as Tarrant has done here, it's going to apply, be consistent with the Oklahoma Water Resources Board permit application policies, as it has done. The Resources Board will assess that permit application just as it would assess an application from. And what does that mean exactly? What would Oklahoma do to evaluate that application and to compare it to other applications from Oklahomans? And also maybe to compare it, maybe there is more than one Texas application. How does the Oklahoma Board make those decisions? It — a permit applicant submits an application which has to demonstrate that it satisfies the standards for obtaining the water. That will be assessed on its merits by the Water Resources Board. If there are competing applications for the same water, then it's done in terms of priority of the — I'm really asking you to tell me what the Oklahoma Board is going to do. I mean, why doesn't the Oklahoma Board just say, you know, sorry, we like Oklahomans? Would that be all right? Well, that — that is their current policy. That would not be all right for two reasons. What different kind of priorities do they have to use, and why do they have to use them is, I think, somewhat along the lines of what the Chief Justice was asking. I suppose there are two points there. One is, if there is enough water to go around for everyone, as in fact there is, then they simply assess it in terms of priority and time. Whoever makes the first application will get it. However, Oklahoma can only get 25 — use 25 percent of the water, and therefore Texas has the right, so long as there is water available, and Texas has not used the 25 percent of the sub-basin water. Texas has the right to seek that anywhere it can get it in the sub-basin, if I may, Mr. Chief Justice. Roberts. Thank you, counsel. Thank you. Ms. O'Connell. Mr. Chief Justice, and may it please the Court. The court of appeals concluded that Oklahoma may categorically foreclose Texas water users from accessing Reach 2 sub-basin 5 water in Oklahoma, and the Court reached that conclusion for reasons that, in the view of the United States, are wrong. First, the court of appeals erred in applying a presumption against preemption to determine whether the challenged Oklahoma laws conflict with the compact. The rationale for that presumption, where it has been applied, is one of federalism, but the States themselves created the terms of the interstate compact, and respect for the States' sovereigns in that context requires enforcement of the compact according to its terms. Second, the court of appeals relied on general compact provisions to conclude that the compact gives States unrestricted authority to regulate the water within their boundaries. But the general provisions of the compact make clear that a State's regulation of water has to be consistent with the allocations made under the compact and each State's obligations under the compact. Kennedy, I'm not quite sure I agree with your reading of the court of appeals opinion. It seems to me the court of appeals opinion is consistent with the Respondent's argument that they looked at the terms of the compact. And it seems to me that you may be right, that the compact either says you get the water or you don't. The Dormant Commerce Clause is just irrelevant. But I read the opinion of the court of appeals as being quite consistent with that proposition. You win or you lose, up or down, under the compact. The Dormant Commerce Clause doesn't just have much to do with it. Well, we agree with that. We don't think that the Dormant Commerce Clause comes into play here. We think that whether Texas can access water in Oklahoma through the Oklahoma permitting process depends entirely on whether the compact gives them that right. Kennedy, that's the way I read the analytic approach of the court of appeals at 39A, when it starts talking about point of section 5.05. Right. And we don't disagree with that, that the Commerce Clause shouldn't come into play here. Where we disagree with the court of appeals is with the court of appeals' conclusion that regardless of whether a State law would frustrate the purpose or pose an obstacle to a State obtaining its share of water under the compact, that that State law should be consistent with each State's obligations under the compact. The compact makes clear that those general provisions preserving State water law need to be consistent with each State's obligations under the compact. And if I could add to that, Justice Sotomayor, if you're relying on the compact and its language, where do you come up with this idea that States first have to try to get their 25 percent from water within their borders? I don't see that anywhere. Well, first of all, we think that that's an issue that if the Court decided that there are errors in the court of appeals' opinion, that should be corrected. We think that's something the lower courts could consider on remand. But I'll tell you where it comes from, which is sections 2.01 and 2.10a of the compact, which preserve the application of State water law. Section 2.01 says that each State may freely administer water rights and uses in accordance with the laws of that State, but that such uses shall be subject to the availability of water in accordance with the compact. Well, it seems to me that you like some provisions of State law, but not others. No. What we're saying is that if there's a State law that conflicts with the allocation or poses an obstacle to the allocation of water under the compact, then it's preempted. But, for example, if Texas could access 25 percent of the water from within its State, then the application of a State law that would bar Texas water users from obtaining a portion of its water in Oklahoma wouldn't necessarily be preempted because it wouldn't pose an obstacle to the allocation. What do you do with the situation, let's say there's Oklahoma water available to Tarrant that is closer than the water they would get from somewhere else in Texas? Do they have to incur the additional expense to get Texas water, or can they take the cheaper route and get Oklahoma water? Well, we think that, again, we think this is an issue for the lower courts to look at on remand, but we think there's a good argument to be made that so long as Texas could access 25 percent of the water within its boundaries, then application of an Oklahoma law that would prohibit Texas from going through the Oklahoma permitting process wouldn't necessarily be preempted. And, again, there are lots of issues, as we point out in our brief and we did at the invitation stage, that would need to be addressed perhaps in further proceedings or perhaps in court. Kagan.         Kagan.    Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan.   I think this brief that you submitted, it gives you kind of a headache that you know and it suggests how difficult the process is and then you look at this provision and maybe this provision can be read as an entitlement but it can just as easily as Justice Breyer's suggested be read as a cap. No more than 25 percent. So as between those two possible readings, the complexity of your way of reading this, which would have why? Justice Kagan, I'd like to, if I could, go to the second point, which is on the whether you read this as a 25 percent entitlement or a cap, and I would like to point the Court not just to the language of the compact, which we think weighs in favor of the idea that each right, each state has an equal right and that the equal right to use the water in the sub-basin implies an equal right, not just an opportunity, but the interpretive comments that follow Section 5.05b, this is at page 30 of the Joint Appendix, refer to a right. The first full paragraph there says when the flows – I'm sorry, it's the second line. If the States have competing uses and the amount of water available in excess of 3,000 cubic feet per second cannot satisfy all such uses, each State will honor the other State's rights to 25 percent of the excess flow. The Red River Compact Commission also approved rules and regulations, and those say they're in page, I think, 19 of the Joint Appendix. I might have that page now. Yeah, I have that page wrong. But the Red River Compact Commission's rules and regulations say that when the flow is above 12,000 cubic feet per second so that Louisiana could get its 3,000 cubic feet per second, each of the signatory States shall be entitled to 25 percent of the total runoff and undesignated flow. So I think it's pretty clear that based on both the text of the compact and the interpretive comments in the rules that the Red River Compact Commission came up with, that there is not just that you can take whatever is in your borders even if that doesn't amount to 25 percent, but that each State is entitled to 25 percent of the water, and that if that involves going into another State within this geographic area that's not defined with respect to State boundaries, then that is permissible under the compact. And as the Petitioner pointed out, when the States wanted to impose a State boundary restriction in the compact, they did so. There are several subbasins that span more than one geographic area or more than one State, and the compact in those provisions says that you can take whatever you want within your boundaries. And I also don't think that this is going to be particularly troublesome to administer. I mean, there may need to be some further proceedings on that, but Oklahoma law provides the backdrop for what would happen when a Texas water user goes in to ask for a permit to appropriate and divert water from within Oklahoma. Kagan. And what does that mean? What would Oklahoma do? Well, the Oklahoma Water Resources Board would just apply its normal procedures and laws to determine whether this particular use of water could be put to beneficial use. If they would just apply whatever laws they would apply to any applicant, regardless of whether they are from Texas or Oklahoma. Kagan. Well, people keep on saying that, and I guess I just still don't understand quite what it means. I mean, let's say Oklahoma, the Board is sitting there and it gets lots of applications from Oklahoma users, and let's say it also gets multiple applications from Texas users, that it's not just one county, it's four counties. What does Oklahoma do to decide who gets the water? Well, I think just as Petitioner's counsel pointed out, there is a priority in water law where whoever submits the application first would get the water if it's available and they can put it to beneficial use. And the Court shouldn't be concerned. I know there are amicus briefs submitted by other Texas entities that would like to have water from this particular subbasin as well. They are all part of the same Regency, and I think they have some way to work it out. Alito, I didn't understand your answer. If you are correct, wouldn't the Oklahoma Board have to give priority to the Texas applicants in order to make sure that Texas got its share of the water? It couldn't just treat, it couldn't just be indifferent as to whether it was an Oklahoma or Texas applicant. True, to the extent that Texas was not receiving its water. I mean, under our theory, which we think could be developed more in the lower courts, if Texas was already receiving 25 percent of the water, then Oklahoma would not have to give it any kind of special priority. But if it was not, then the Oklahoma Water Resources Board would treat it just like an Oklahoma applicant. Is it correct that there are reservoirs in Texas that flow into, from which water is released into the Red River? Yes, and in Oklahoma as well. And what if Texas didn't, what if Texas could get, could release that water and increase the flow of the river, but it chose not to do so, so it could take other water out of the river? This is the last point made in the Respondent's brief. And the response to that would just be that all of the States would have the opportunity to do that. In fact, the whole subbasin is defined by the last major dam site on the tributaries that are running in. So Oklahoma could do the same thing. And also, when the reservoirs are full, they're full. It's not like Texas could keep all of the water that's there from flowing into the bottom portion. Breyer. We're only considering the instance where there isn't enough water to meet the 25 percent in Texas. And in that instance, I guess there are 50,000 places, not just in Oklahoma, but also in Arkansas, where they might get some. And on my question, and I think that was being asked, is there anything else you want to say as to why that's an easy matter to decide? Well, it's — we don't think it needs to be decided in this particular proceeding. I think there are two errors that the court of appeals made in applying a presumption against preemption and in concluding that a Texas water user could never divert water from outside of its State. Those could be developed — those additional problems could be dealt with by the Oklahoma Water Resources Board, or as we've said, perhaps in an original action. Thank you, counsel. Ms. Blatt. Thank you, Mr. Chief Justice, and may it please the Court, if I could just address two sort of factual questions. Under the actual Red River Boundary Compact, the lawyer for Tarrant was wrong. There's actually a strip called Shawnee Creek, from the Denison Dam to the Shawnee Creek, that actually belongs to Texas. So there's a piece of the Red River in this very sub-basin that is — it's in the express boundary compact. Moreover, all of the Red River and Lake Texoma that is in Texas is part of the main stem, and that is not only in the land of Texas. Texas users draw water, quite a lot of water, from Lake Texoma. So that's two places on the main stem. Are they like — So I'm sure you're saying that the State of Texas can take water directly from the main stem? It can and does. That's my point, yes. Anywhere close to the 25 percent they claim entitlement to? Well, who knows? I was hoping you did. Who knows? Texas has more than a dozen fresh tributaries running from Subbasin 2 and Subbasin 4. I'm talking about Subbasin 5. Subbasin 5, these are all — excuse me — these are tributaries that run into Subbasin 5. There's more than a dozen tributaries in Subbasin 5. For 30 years, no one has ever kept track of any kind of accounting whatsoever. So when we say, who knows, that is the way the drafters — it's not only the way the drafters intended, but that has been the state of play for 30 years. So nobody — and the laws of Louisiana and Arkansas don't even track diversions. So there's — Just to be clear, in your view, Texas can, without going on Oklahoma property, take water from the main stem in Basin 5? In Subbasin 5, there's only up from Denison Dam east to Shawnee Creek. So that's just anywhere from a half a mile to three-quarters. It runs from the — from the middle of the channel. East — excuse me — west is Lake Texoma. And if you want to look at the map, it's a big old lake. That is a lot of water. And they definitely do take — and that's in the brief — they take lots of water from that lake from the Texas side. But my question was, can they take it from the main stem? Only in that — that little slip of land to Shawnee Creek, it's part of Texas. Is that the part that, under their allegation, at least, is saline? Well, again, they drink the water in Subbasin 5. Is that the part that they're referring to when they say it's too saline? Yes. They think all the water that their residents drink is salty, but they still are drinking it. They're drinking it. In fact, their footnote 3 and footnote 4, their water planning documents say this is a — quite a drinkable source of water. I understand they think it's salty, but they drink it. When they take water from the main stream of the Red River, how do they know how much of that water is from Reach 5? Well — They're entitled to no more than 25 percent from Reach 5. Is everything that comes into Texas in the main channel of the Red River water from Reach 5? So if you look at the — if you look at the map in the red brief that's got all the colors, and the pink is Subbasin 5, so where they divert water from is all up and down those blue tributaries that are in pink south of the Red River. Now, what page are you looking at? This is 33A. Oh, yeah. Okay. This map. Yeah, yeah, yeah. So they — and then if you look at that blue lake that looks like a dragon, that's also where they're taking water. That just happens to be in Reach 1. But their water planning documents show that all the water in the pink on the Texas side is a very valuable source of drinking water. And if you see all the way down to Lake Texarkana, they can — they're taking that water, too. And when we say about what we know, no one has ever done any accounting because the Equal Rights Clause has always been read as an equal rights to the use of the water without prejudice to or from each other's State. And in that sense, it means that if one State took an earlier use of the water, it wouldn't gain a priority indefinitely over the other State. Well, it never — it never says that. I mean, that's why we have a case. It never says it has to be from your State. And I appreciate your — the focus in your argument on State sovereignty, but this is an interstate compact. And the whole point of interstate compacts is that we have to — each State has to give up a little here or a little there to solve a problem. So I guess it's — I don't know why these basic principles of State sovereignty apply in the context of an interstate compact. Right. I mean, it is our position that the States would have never agreed to this extraordinary right without an unequivocal, explicit statement. But I do think it is absolutely critical to understand that what they are asking for is unprecedented, Mr. Chief Justice. There has never been a cross-border diversion ever under any State water compact. And the two examples they cite in their reply brief are inexplicable, absolutely inexplicable. They cite the Niobrara compact with no cite. They cite the compact, but they never say there's been a cross-border diversion. And if you look on the map — Ginsburg. Say that again, because we have a green brief that gives us samples of provisions for cross-border. Yeah, under explicit, right. There's never been a cross-border diversion without an explicit statement. Not only — Any with explicit statements and then the essential bells and whistles as to eminent domain, points of diversion, and which choice of law. And what they tried to say, because we've been saying all along how unprecedented this would be to sort of read in silence on borders, they tried to come up with two examples in their reply brief. And that's what I'm talking about. The reply brief not only is devoid of a citation, but Nebraska and Wyoming told both us and Wyoming told Terrence Council that there have never been diversions. And Nebraska was quite like, wow, we hadn't known that. And it shows the danger of their position. They think if it's silent as to borders, the State of Wyoming could go hundreds of miles into Nebraska and take the water across the border. The other example they cite is fascinating because it's a lawsuit before you. They cite the Rio Grande compact as a basis for saying El Paso can walk into New Mexico, but their lawsuit to you is based on the notion that Texas can't go into New Mexico. It's New Mexico has a downstream delivery. So there was a point that seemed to me to favor them, which is go back to 1970, the 70s, when they drafted this. I'm there. So they're in the room and they're representatives of all four States and they say, okay, there's going to be more than 3,000 feet. What happens? And Louisiana would say, we want at least 25 percent done. Arkansas, 25 percent done. Oklahoma, same, done. Texas, same, done. But everybody in the room knows that Texas could never get more than 12 percent within its borders. And since it could never get more than 12 percent, Louisiana would be sitting there with not really 25 percent, but with 38. And so that suggests that, hey, no, they all knew this, and so they meant there must be some way for Texas to get the extra. Otherwise, why were they saying 25 percent for Texas? And so that's just not true. What they cite, too, is a 1970 engineering report. Breyer, this is an example I made up, because I think an imaginary conversation. Look, it's an imaginary conversation. 34 percent of the watershed is in Texas, so there's no reason to think anyone thought Texas couldn't get its share. Why? Because there's no evidence there was any discussion about any State and whether Texas never complained, no one ever said Texas couldn't get its water. Wouldn't that be a fairly easy thing to check, going back to 1970, to find out whether, you know, Texas was just on some little salt flat by the river? Sure. They did. They did in their brief, and they came up with an 11 to 16 percent. Our engineers ran the numbers after correcting their three serious methodological errors, and we came up with 29 percent. They double-counted streams. They forgot that Subbasin 5 is not only runoff, but also rain. And then, this one's humorous, they didn't count the excess. So all the math that they did favored Texas, so the math didn't come out that way. But what's interesting about the Terrance view, and juxtaposing with the United States view, Terrance view is it could have all the water, but they could get all of it still from Oklahoma. So Louisiana, Arkansas, and Texas could come take all their share from Oklahoma, forcing Oklahoma to have to go south. Now, the United States view, and this is why they read a border limitation in there. They say, look, borders are here, but if Texas really needs it, you've got to let them come in. That's the United States. They definitely, which I don't understand their reliance on the Rosello principle, because they read borders into this. Texas has actually disavowed this view. Terrance disavowed it. They disavowed it to the Tenth Circuit when the Tenth Circuit asked for what their standing would be to press it. They said we've never believed this. Sotomayor, what do you think is the remedy? Meaning, let me just posit the point, okay? I understand your point to the Chief that there's been no proof that Texas doesn't get its 25 percent or that it couldn't get it from the main stem or somewhere. I accept that. But let's, for the hypothetical, say that there's a major drought and Texas can't get it from its portion. What's its remedy? That it's not getting 25 percent as the compact entitles it to. Okay. It's the last statement. The compact, no way, no how, entitles the parties to equal 25 percent. It just doesn't say equal rights to a numerical share. It doesn't say equal rights to a numerical quantity. It says, Sotomayor, shall have equal rights to the use of runoff originating in subject S&P 500. Right. And you and I could have equal rights to the use of the family car or equal rights to the use of the highway. That doesn't tell me anything about how many hours I can spend on the highway. But here's the problem. The real problem is with the cap. Okay. Their view is that the first clause gives you an absolute equal right to a fixed 25 percent, no exceptions. But then you have this provided clause, which does no work for them. The provided clause, which says you don't get any more than 25 percent, they're saying, well, by definition, if you get exactly 25 percent, the State can take no more than 25 percent. So they actually just sort of combine the two. The other, I hate to point this out, because I feel a lot of affinity for the United States, but their proof for why this is affinity for them. But listen to their proof for why there's an equal 25 percent. I am, but it used to work for them. They say, well, we're guaranteed an equal 25 percent share, and they cite the compliance rules on page 19. And entertainingly so, the rules that they cite just disprove what they said. The first rule they cite only gave three States. They divided it by three instead of four. Their view, the United States' view, is there's a guarantee of 25 percent of any amount that's in excess of 3,000. Kennedy, this is a perfectly legitimate argument for you to make, but I want to go back to Justice Sotomayor's question. At least as I understood it, it's this. I want you to assume, I know you don't agree with that, I want you to assume that the Compact gives Texas a right to 25 percent of the excess, of the water, above the cubic foot. Yeah, the excess, yeah. I want you to assume that. Now, wouldn't the Compact be meaningless if Texas couldn't actually reach that water? That is the United States' view, and they'd have to go above it. What they would have to do, which no one else, no one has done, and I think the drafters thought it was ultimately impossible because of Arkansas, Louisiana, is call for an accounting and actually figure out what the total was, figure out what the excess was, divvy up the four shares, do exactly what Tarrant wants, I guess, to happen, which has never happened, and it's not clear to the drafters of the compliance rules that it could, in fact, ever happen because of the riparian laws of Arkansas and Louisiana. But, so in other words, if we lost this case, which is probably why Tarrant is disavowing the United States' view, is Texas would be in a quite of a pickle trying to prove they couldn't get their 25 percent. And so I read Tarrant as saying, don't you dare send us back to try to prove that. We want to be able to go whole hog into Oklahoma. And if I could get to the point that Justice Kagan was talking about, what's on the ground happening, and why Oklahoma would have never agreed to this type of cross-border right, because what Tarrant is doing is exploiting Oklahoma's law, which proceeds on the assumption that water in Oklahoma is a public trust that's held for the exclusive benefits of Oklahoma. And there are three ways where Oklahoma would not have agreed to this and it would have been carefully articulated in a compact. The first is prior appropriation. There are four Texas entities that have signed up for permits, the Upper Trinity, the North Texas Municipal Water District, Irving, and Tarrant. And poor Oklahoma City got sandwiched in the middle. It beat Trinity to the permit office by 24 hours. And so, not surprisingly, if it's open season for Oklahoma water, all of North Texas has come in and sought a permit. And there's a priority. Roberts, even if you take within State, all of these people, if they were applying for water in Texas as well, there would be the same issue there. One of them would beat the other one. It's a question of priority. You're just claiming that everybody from Oklahoma should have, well, not absolute priority, but. I have two points. First, had Oklahoma seen this coming, since they hadn't heard about this until Tarrant filed its application, Oklahoma City certainly would have gotten in line faster. And second of all, the whole point of this compact, and if you think about your equitable apportionment doctrines, which whoever gets to the water first gets a prior, gets a priority permanently, this was the point of the compact. Louisiana and Arkansas wouldn't have to develop their water. Texas and Oklahoma were much more economically developed States. And the equal rights prevented a race to the permit office. Let me get to the second aspect, what's the problem. And that is compacts usually spell out the points of diversion. The last place Oklahoma would have picked as the points of diversion is the Kiamichi River. And Tarrant is saying, not surprisingly, it's the most desirable. And the third is the eminent domain. Eminent domain law in Oklahoma proceeds on the assumption that those are Oklahomans who got the permit and thus can exercise a core sovereign power. And Tarrant, not surprisingly, would like to come in and do that. And none of this is happening with the normal political checks in Oklahoma. Oklahoma can't vote out of office the Tarrant officials. They cannot vote out of office the Upper Trinity or the North Texas Municipal Water District. Ginsburg. Does Oklahoma law in any circumstance permit an appropriation of water, water in Oklahoma for out-of-State use? Well, it's – if it's compacted water, you have to get legislative approval. And it just – here and now, does Oklahoma ever permit out-of-State use of its water? It has not. It could, but the – but Tarrant is correct that there are facial differences with respect to out-of-State. So out-of-State users would have to get the water going faster. It's subject to a review, and there's a statement in there that you need to look and see if there's a better use for Oklahoma. Now, I hope you ask them this, because I gather their view is under the Dormant Commerce Clause is all of those laws are constitutional with respect to 99 percent of the compact, which is it's allocated to Oklahoma for its free and unrestricted use. So they're basically saying there's 1 percent of this compact that's unconstitutional. And not only is it 1 percent, the minute it drops below 3,000, all of a sudden it became. And this would like to talk to the Rizzolo principle. I also hope you ask them, and this is on page 15a of 14a of the 15a brief, there are border references arbitrarily, and they're missing, they're there, it's completely inconsistent. And this – their view would make complete mincemeat out of four other provisions of the compact, and ironically, it would march a lot of States into Texas. But back to B2 and 505C operate identical in that they're basically downstream delivery where all States have to release 40 percent of the water downstream. So they're the same. They're absolutely identical. You hold on to 60, you let 40 percent go. But only C contains that border reference. Only C says within their respective States. And yet, even in C, it's completely redundant and unnecessary because you can't release water from without your State. This is on page 14a and 15a, sorry, of the red brief. So only C says within their respective States. But B2 is the exact same functioning provision, and it's missing the border reference. And you don't have time now to ask the United States' view, but I think the United kind of the magical meaning, borders kind of appear and disappear with the water flow, which is very strange. Tarrant thinks that there's some heretofore unheard of crediting system, but they don't have an explanation on how B2 and C. But more importantly, if you could just turn to 9a for just a minute, which is 402. I want to walk you through this. I'm sorry, 401B. This is a provision that just is water wholly within Texas. And you don't have to understand much to know that Texas keeps 60, Oklahoma gets 40. So you have a big chunk of Texas, and Texas is allocated 60, Oklahoma is allocated 40. Now, under Tarrant's view, because this is silent as to borders, and because Oklahoma is not in this reach, it's not actually located within the subbasin, Oklahoma either is entitled to or has to go get all of its water from Texas. And this pattern repeats itself. This is on page 41 of our brief, throughout the compact, where the compact is silent as to borders, and under their view, and their Louisiana view, is somewhat entertaining. I can't tell if they think Louisiana can go into Oklahoma or has to move one inch up to the border to take it out, as opposed to just waiting. But under this view, and again, it repeats itself throughout the contract, the State that's not in the basin, because there are no borders, and because, I guess under their view, the only way that Oklahoma could get its water would be to go into Texas. And that's why they're sort of taking this bet about, oh, this Rosello principle, if it's here, it must mean it must have had significance, would make a complete mess of the compact. If I could also just turn to the remand of the United States, I just wanted to make three points, and that is, I do think it is significant that it's pointed, it is addressed to a problem that Texas itself has never asserted. They're saying, well, if poor Texas can't get its water, and remember, Texas is upstream, so this sort of poor Texas is only to Texas. No other State is going to have this problem, because the rest are downstream. So this, you have to be able to get to your 25 percent, is a uniquely pro-Texas provision that apparently, at the same time, for 20 years of drafting history, when Texas was trying to buy this water, and the three States were saying no way, no how, they either subconsciously or unconsciously or unintentionally enacted this provision for Texas' benefit. Breyer, in Subbasin 1, that's mostly in Oklahoma, but Texas gets a lot of the water or the other way around. It looked to me like Subbasin 1 is in Oklahoma. Which reach? Are we? Subbasin 1. The thing you pointed to says Subbasin 1. Are you talking about 401? Yeah, 401. Okay. So that's in Reach 1? So that's on this map, the next map? So none of it, it's all within the green that's what we can't handle in Texas. Anyway, because of that, and because during the time when let's say there's 5,000 feet, of the 2,000 extra, you know, Louisiana has to get 500, okay, how do they know what they're getting? I mean, there must be some system of measurement going on, or how does this all work? Justice Breyer, you have to trust me. There has never been an accounting, ever, ever, ever, ever, under the Compact. So no measurements have ever been taken with respect to this. Fine. So I don't know how that cuts, because certainly the people who drew this must have thought, at least in those other provisions, they are going to develop a measurement system in case of controversy. Well, there are gauges. So they, I mean, it would not be impossible, although very expensive. And just so you know, Section 211 and in the interpretive comments of 211, the State said the last thing we want is this accounting because it's expensive and burdensome. And Louisiana and Arkansas, if you look at the minutes, they're complaining because their laws are not set up for accounting. They're riparian States, so they don't track diversions. They just, they don't do it. So this was, this is, when you talk about how this cuts, you have 20 years of silence. Scalia I don't understand what you just said. They're riparian States, so they don't track diversions. Why does that follow? So in the Oklahoma and Texas, in their permitting system, what they permit, they track how much you take under the permit. They measure. Louisiana, if you're a landowner, you just draw from the water, and it's a voluntary reporting system, so you don't necessarily have to tell the State how much you took out. So what is a permitting system in Louisiana and Arkansas? And I think, again, the minutes just talk about we hope Louisiana and Arkansas will develop their laws to do better tracking of diversions. But, again, this would be the problem of an accounting. But I, so in terms of the 20 years of history, you have complete silence on this, even though under our view it always. Breyer The relevant legal argument, I think, is look at what you just cited to us about this reach in the sub-basin. 60 percent goes to Texas, 40 percent to Oklahoma. Okay? Now, they've never measured it. That's because they never fought about it, I guess. And now we have a fight. So why is it any easier to develop the necessary measuring system there than it would be here? And that argues against you, because your main point really is that this is all too complicated. Sotomayor Justice Breyer, the disaster would be, and the affront to sovereignty is throughout the compact. It's not so much the measuring that's a problem. Oklahoma would be able to insist on crossing Texas's borders to draw that 40 percent. And no one has ever, ever envisioned any of the compact as not applying borders. It's not so much the measurement. Roberts Well, I thought that was what the other side does envision, that it doesn't, it's not bound by the borders, but it's bound by the agreement, the compact. Compacts compromise the individual state's sovereignty. That's the whole point of them. Sotomayor Okay. But if their view, I mean, it is, then they have to be, again, our view is that if they had wanted, like all the other cross-border rights, to allow for an extraordinary right, they would have made an explicit statement and then spelled out exactly what that meant, most importantly the point of diversion. Here, at most, you have silence on the issue. Now, the government reads into borders sometimes because they say you do have borders unless there's a need. Under Terrance's view, which I think is the most jarring and remarkable view, this is all a borderless common, and every State could have crisscrossing pipelines into every State because you don't have an exhaustion requirement. So Texas, even though it's got plenty of water in its freshwater streams and currently uses them, could take their whole 25 percent from Oklahoma. Oklahoma could take its whole 25 percent from Texas. Arkansas could come into Oklahoma. And that's their view of the world. And I think the United States thought, no, that doesn't make too much sense, let's at least make Texas exhaust. But the provision, the compact doesn't say this. Again, the United States and Terrance proceed on the assumption that there's a numerical share, that it's equal rights to an exact 25 percent, exact 25 percent. Well, that's not what it says. It just says equal rights to the use subject to a cap. And we think a cap, by limiting the use, is not a guarantee that you can reach the cap, much less that you can cross borders to reach the cap. And if I could just, what, make one more sense of that. Kagan. Kagan. Kagan. Kagan. The Solicitor General here today spoke of lots of different examples, where the language of entitlement and rights was used. Do you have a view as to that? So, they, I mean, the two compliance rules they cited? They cited, so they say, that's what I was saying that was sort of sad, is because what they cited disproved what they were trying to assert it for. So, if you, you don't even have to read the, you don't even have to read the compliance rules, just read page 19 of their brief. They say in the same sentence that we have an equal, there's an equal rights to one fourth of an excess above 3,000. So, that means you take whatever's above 3,000 and divide by four equally. And then they cite a provision that only divides by three. And then the next provision they cite didn't divide the excess and divided the total water. I don't know why they did that. It's inexplicable. I can't tell you why they did that. And the only other thing I want to say on the extrinsic evidence, and I do think if you think there's any ambiguity in here, which I think there clearly is, you have 30 years of post-ratification, which the States immediately did long-term water planning without so mentioning of this right. And Tarrant actually offered to buy the same water for $1.7 billion in 2002, which is a little bit inconsistent with the notion that they had this right all along. They just in 18 months of negotiating history never mentioned that they thought they owned the water. They were actually offering to pay $1.7 billion. And the amicus brief filed by the tribes on page four says we were at the negotiating table. And we never heard Tarrant mention this right. And the other thing, I do think the water planning documents are highly significant because not so much Louisiana and Arkansas, but Oklahoma and Texas take water planning very seriously because of their prior appropriation systems. There are hundreds of thousands of pages on the Internet and none of them mention this right. Again, they cited something in their reply brief, but if you go look at it, it doesn't come close to mentioning a right in Subbasin 5. Again, ironically, it mentioned a portion of Oklahoma where Texas would have to actually  We'd ask you to affirm. Thank you. Roberts. Thank you, counsel. Mr. Rothfeld, you have four minutes remaining. Rothfeld, thank you, Mr. Chief Justice. Just a couple of points. First, my friend Ms. Blatt said that it would make mincemeat and a complete mess out of the compact to apply its terms as they were written. We think that this compact was negotiated over a period of 25 years. If you look at the joint appendix, you will very painfully see that there are reams and reams of commentary on the negotiations. I think the Court has to assume that when the drafters of the compact used language and referred to State lines in one place and not in another place, they had some idea of what they were doing and they made these different choices intentionally. So I think the Court simply should read the terms of the compact. Sotomayor, so how do you deal with all the provisions she was mentioning with respect to the 6040 division? I can't make rhyme or reason of those provisions that don't use within State boundaries, but that has to mean that. Well, I don't think that it has to mean that. If Oklahoma wants to enter Texas to take the – if it makes more sense for them to do it, they can. If not, they can just wait for the water to flow down. I think one thing which Ms. Blatt did not address is the practicalities of how Subbasin 5 operates. If you look at the map that was pointed out to you, Subbasin 5, which is what we are talking about here, is a very wide, hundreds of miles wide, but extremely narrow. It's 10 to 20 miles north to south, or most of its length. The reason that the drafters drew this is because the States all take – the assumption was all of the water in this subbasin was going to be surplus water, literally excess water. The States all take the water that they want to use outside of Subbasin 5. And so the allocations that Ms. Blatt was referring to by Oklahoma are all in Subbasin 1. They are not in Subbasin 5. The water that flows into Subbasin 5 is water that the States assumed was going to be surplus. And so it would make no sense, having divided this water evenly between the compact states, to think that the drafters would have required a water user in Texas at the far west end, which would get its portion of the 25 percent share 2 miles across the border in Oklahoma, instead to have to go 200 miles to the east to get it out of Texas. That is not what the drafters intended to accomplish by this. They created, by the plain terms of the language, a common pool of water defined by dam site, not by State line, and gave each State equal rights to access that water so long as they did not use more than 25 percent. Your response to the question, which was raised by Justice Kagan, both to me and to Ms. Blatt, I think the practical application of this is very simple. One simply has to apply to the permitting authorities. Wherever you are submitting your application from, they will apply their ordinary standards. The Oklahoma Water Resources Board does that now for applications from within Oklahoma. It can do it just as well for applications from Texas or from other States. And, again, the practicality of this is water users are going to want to use water as close to where they are located as they can. They are going to go right across the State line within Subbasin 5 if that's the place to get the water. It makes no sense to require them to go hundreds of miles to get it, distant to get it. Ms. Blatt suggested that we are reading the 25 percent limitation out of the compact. I think her reading reads the equal rights language out of the compact. They read the Subbasin 5 language as being all cap and no entitlement. It does two things. It gives equal rights to the water and then says, but you can't take more than 25 percent within your State. So it's designed to do two things. It's designed to give you an entitlement and to say you can only use 25 percent of it. And, finally, Ms. Blatt raises the questions of sovereignty and political concern. As the Chief Justice suggested, this is a compact. It's an agreement between coordinate sovereigns. They have decided what they want to do. And the thing that gives respect to sovereignty is to write, is to read the plain language of the compact as the Framers wrote it. Again, they spent 25 years writing it. They took considerable care, as you can tell if you look at the negotiating history, in using the words for each provision. Those words should be given meaning. If there are no further questions. Thank you, Your Honor. Roberts. The case is submitted.